UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HAROLD DEWITT WATSON,

                Plaintiff,                      Civil Action No. 4:12-cv-10496

        v.                            District Judge Gershwin A. Drain
                                           Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

## REPORT AND RECOMMENDATION TO
## GRANT IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [11] AND
## DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [14]

Plaintiff Harold Watson appeals Defendant Commissioner of Social Security's denial of his application for period of disability and disability insurance benefits. (*See* Dkt. 1, Compl.) Before the Court for a report and recommendation (Dkt. 2) are the parties' cross-motions for summary judgment (Dkts. 11, 14). For the reasons set forth below, this Court finds that the ALJ erred in evaluating an opinion of one of Watson's treating physicians. This Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 11) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (Dkt. 14) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

## I. BACKGROUND

In January 2009, when Watson was 46 years old, he was involved in an auto-accident.  (Tr. 217.)  Apparently, the car in front of Watson's began to accelerate through a yellow light with Watson following; the car then came to an abrupt stop resulting in Watson rear-ending the vehicle. (Tr. 275.)  Prior to the accident, Watson labored at a construction company for over twenty years. (Tr. 277.)  Watson has not worked since the accident.  (Tr. 27; *see also* Tr. 12, 130.)  He asserts that shoulder and leg pain primarily prevent him from doing so.  (*See* Tr. 34.)

### A.  Procedural History

On April 12, 2010, Watson applied for period of disability and disability insurance benefits asserting that he became unable to work on January 4, 2009.  (Tr. 10.)  The Commissioner of Social Security ("Commissioner") initially denied Watson's application on August 16, 2010.  (Tr. 10.)  He then requested an administrative hearing, and, on June 9, 2011, Watson appeared with counsel before Administrative Law Judge Oksana Xenos, who considered his case *de novo*.  (*See* Tr. 10-20, 24-43.)  In a June 24, 2011 decision, ALJ Xenos found that Watson was not disabled.  (Tr. 10-20.) Her decision became the final decision of the Commissioner on December 6, 2011 when the Social Security Administration's Appeals Council denied Watson's request for review.  (Tr. 1.)  Watson filed this suit on February 3, 2012.  (Dkt. 1, Compl.)

### B.  Medical Evidence

Six days after his motor vehicle accident, on January 8, 2009, Watson went to see Dr. James Beale, an orthopedic surgeon.  (Tr. 198; *see also* Tr. 275.)  Although Dr. Beale's handwriting is difficult to read, Watson apparently reported neck pain, leg numbness, and tingling in his toes.  (*Id.*) Dr. Beale diagnosed Plaintiff with cervical, dorsal, and lumbosacral sprains.  (Tr. 199.)  He

4:12-cv-10496-GAD-LJM   Doc # 15   Filed 03/11/13   Pg 3 of 20   Pg ID 483

prescribed Vicodin and Flexeril.  (*Id.*)  Dr. Beale provided that Watson needed transportation to all his medical appointments and needed help with the "outside chores of his home."  (Tr. 201, 203.) Later in January 2009, Dr. Beale wrote a short "Disability Letter," providing that Watson was "disabled from work/school until further notice."  (Tr. 193; *see also* Tr. 189-94, 196-97.)

In February 2009, Dr. Beale continued to provide that Watson was disabled from work.  (Tr. 185.)  A cervical spine MRI showed "[m]ultilevel degenerative changes with disc protrusions . . . ." (Tr. 213.)  A lumbar spine MRI showed "degenerative changes at multiple levels," "right neural foraminal narrowing at L5/S1," and a "central disc protrusion at L5/S1."  (Tr. 208-09.)

In March 2009, Dr. Beale wrote a letter to Watson's auto insurer.  (Tr. 179.)  He provided that Watson needed transportation services "[b]ecause [he] has difficulty raising his left arm above shoulder level, and turning his head from side to side . . . ."  (*Id.*)

Around this time, Watson began seeing Dr. Lawrence Konst, a neurologist.  (Tr. 217.) Watson reported numbness and tingling in his arms and legs.  (*Id.*)  Dr. Konst ordered EMGs of Watson's extremities and planned to review the February 2009 MRIs.  (*Id.*)  The next month, on Dr. Konst's referral, Dr. Joel DeGuzman, a physiatrist, provided "trigger point injections" in Watson's neck and upper and lower back. (Tr. 172.)

In April 2009, Watson returned to Dr. Beale; he did not alter his diagnoses and continued Plaintiff on Vicodin and Flexeril.  (Tr. 174-75.)

In May 2009, Watson saw Dr. J. Alan Robertson, an orthopedist, for the first time.  (Tr. 275-82; *see also* Tr. 251-254, 259-62.)  Watson reported pain in his lumbosacral region and in his upper trapezious bilaterally.  (Tr. 276.)  He also told Dr. Robertson that his feet felt like they were in ice. (*Id.*)  Watson showed Dr. Robertson that he could not abduct his left arm more than 45 degrees.

(*Id.*) Dr. Robertson also reviewed Watson's imaging studies. (Tr. 277-79.) His impression was that Watson had spondyloarthrosis and a "neurocompressive-appearing protrusion" at L5-S1. (Tr. 278.) On exam, Dr. Robertson found "subtleties of impingement and some weakness" in Watson's left shoulder. (Tr. 279.) He also provided that Watson should "avoid participating in those activities [that] may place a load upon or otherwise strain his musculoskeletal system" and believed that Watson needed replacement services for "manual chores" that placed such a load. (Tr. 281.)

Later that month, Dr. Robertson reviewed a recent shoulder MRI, and diagnosed Watson with left-shoulder trauma with resulting bone marrow edema and an incomplete tear of the supraspinatus tendon. (Tr. 286.) He also diagnosed neck trauma with resultant cervicocranial head pain syndrome and low-back trauma "activating preexisting and dormant Disc Joint Disruption[] at L5-S1." (*Id.*) He planned to have Dr. Jerome Ciullo, "the area's premier shoulder surgeon," evaluate Watson's left shoulder. (*Id.*; Tr. 245.)

In June 2009, Dr. Ciullo took Watson's medical history, performed an exam, and reviewed imaging studies of Watson's right and left shoulders. (Tr. 290-93; *see also* Tr. 221-27, 248.) Dr. Ciullo's impressions were

> Left shoulder[:] mesoacromial fracture[,] . . . question of [a superior labral anterior-posterior ("SLAP")] lesion, with severe degenerative arthritis at the A/C joint.
>
> Right shoulder[:] A/C joint arthritis, subacromial impingement, question of internal derangement.

(Tr. 290.) Dr. Ciullo recommended an arthrogram, physical therapy, and electrical stimulation. (Tr. 292.) He also noted "[s]urgery is future consideration for . . . both shoulders." (Tr. 292.)

Later in June 2009, after reviewing a recent EMG of Watson's lower extremities, Dr. Robertson amended his low-back trauma diagnosis to include low-grade left-side L5-S1

4

radiculopathy. (Tr. 246.) Dr. Robertson's plan was to address Watson's lower-back problems after addressing his shoulder problems. (*Id.*) He provided that Watson was "[d]isabled at this time." (Tr. 247.)

In July 2009, Watson had a follow-up with Dr. Ciullo to review the arthrogram results. (Tr. 228.) The arthrogram of Watson's right shoulder showed a superior labral tear, arthritis, and anterior capsule and cystic changes. (*Id.*) On the left, the arthrogram demonstrated arthritis, a labral tear, and a mesoacromial fracture. (*Id.*) To treat the fracture, Dr. Ciullo fit Watson's left shoulder with an Electrical Stimulation of Bone Healing coil. (*Id.*)

Later in July 2009, Dr. Robertson noted that Dr. Ciullo had canceled planned right-shoulder surgery because Watson's insurance benefits had been discontinued. (Tr. 298, 302.) Dr. Robertson maintained his diagnoses and continued Watson's medication (Vicodin and Flexeril). (Tr. 299.) He further provided that Watson was "[d]isabled" and needed household assistance. (Tr. 300.)

In September 2009, Dr. Ciullo noted that Watson had a mesoacromial fracture in the left shoulder and a SLAP lesion in the right. (Tr. 229.) On exam, Dr. Ciullo noted that neither shoulder had "significant weakness," but Watson complained of pain during certain testing of both shoulders. (Tr. 229.) Because Watson's left-shoulder fracture showed some healing, Dr. Ciullo's plan was to surgically repair Watson's right shoulder first. (*Id.*)

Dr. Ciullo also completed a "restriction/disability certificate" on September 17, 2009. (Tr. 232; *see also* Tr. 233-34.) He provided that Watson could not push, pull, or lift more than 15 pounds, could engage in no overhead activity, could not do any work above shoulder level, and could not work with vibrating, impact, or torquing tools. (*Id.*) Dr. Ciullo provided that these restrictions were effective "pending surgery." (*Id.*)

5

Later in September 2009, Dr. Robertson examined Watson and provided that he was "physiologic throughout his four extremities" with "no long tract signs." (Tr. 307.) Dr. Robertson maintained, however, that Watson was disabled. (Tr. 307-08.)

In October 2009, Dr. Ciullo noted that Watson's left-shoulder fracture had healed with the use of the electrical simulator. (Tr. 230.) Further, Watson's left-shoulder range of motion had markedly improved. (*Id.*) Nonetheless, Dr. Ciullo believed that Watson still needed left-shoulder surgery: a subacromial decompression (removal of inflamed tissue or bone spurs from around the rotator cuff) and a Mumford procedure (opening of the acromioclavicular joint space). (*Id.*); Mayo Clinic Website, Rotator Cuff Injury, http://www.mayoclinic.org/rotator-cuff-injury/treatment.html (last visited Feb. 26, 2013); The Stone Clinic Website, Mumford Procedure Overview, http://www.stoneclinic.com/mumford-procedure (last visited Feb. 26, 2013). As for Watson's right shoulder, Dr. Ciullo performed an objective test for a SLAP lesion and remarked that the lesion could not heal without surgery. (*Id.*) He provided that Watson's right shoulder required a SLAP lesion repair, a subacromial decompression, and a Mumford procedure. (*Id.*) The surgeries, however, could not be scheduled until Watson resolved his insurance issues. (Tr. 312.)

In December 2009, Dr. Robertson provided, "[t]here is little that I can do other than to prescribe medication." (Tr. 317.) Dr. Robertson continued to indicate that Watson was "[d]isabled." (*Id.*)

In January 2010, Watson told Dr. Robertson that the pain down his left leg had increased, especially around his left knee. (Tr. 320.) After examining Watson, Dr. Robertson again provided that there was little he could do other than prescribe medication, and that Watson remained "[d]isabled." (Tr. 321.) Dr. Robertson made similar findings in February and March 2010. (Tr.

6

323-25; Tr. 326-28.)

In April 2010, Watson reached a settlement with his insurer and his benefits were restored. (Tr. 329.) Dr. Robertson provided that after past-due amounts were paid, he would move forward with treatment for Watson's lumbar radiculopathy. (Tr. 330.) He noted, "I suspect that Mr. Watson will need to be surgically decompressed." (*Id.*)

That month, however, Watson experienced episodes of chest tightness at rest and shortness of breath when climbing stairs. (Tr. 269.) Watson was diagnosed with benign hypertension, hyperlipidemia, and an abnormal echocardiogram most consistent with left ventricular hypertrophy, and cardiomyopathy. (Tr. 270.) Watson's left-shoulder surgery was postponed because of these cardiac problems. (Tr. 332.)

In June 2010, Dr. Robertson placed Watson in a lumbosacral orthosis (a type of back brace) and provided that, other than physical therapy, further back treatment would be postponed until after Watson's left-shoulder surgery. (Tr. 336.) The next month, Watson reported to Dr. Robertson that the back brace had worked extremely well in reducing his back pain. (Tr. 339.) Dr. Robertson, however, continued to provide that Watson was disabled. (*Id.*)

In October 2010, Dr. Ciullo noted that x-rays of both shoulders demonstrated "significant impingement" due to "huge" bone spurs. (Tr. 379.) Dr. Ciullo remarked, "[a]s soon as he gets medical clearance we will get him scheduled for left [shoulder surgery] first, and once that recovers, we will take care of the right side." (Tr. 379.)

On January 10, 2011, Dr. Ciullo performed surgery on Watson's left shoulder. (Tr. 384; 388-90.)

A few days later, Watson saw Dr. Robertson for his back pain: "Mr. Watson states that his

lower back continues to be a major source of pain and he inquires if something can be done, more aggressively, to address [the pain]." (Tr. 391.) Dr. Robertson examined Watson and noted,

> Palpation of the musculature about Mr. Watson's lower back notes a low-grade/chronic type of extensor spasm bilaterally. Mr. Watson is rather protected to guided active movement of his lower back and ROM is compromised by at least 25% throughout each of the cardinal planes.

(Tr. 391.) Dr. Robertson scheduled Watson for a lower-back MRI. (Tr. 392.) He also noted, "I understand that Dr. Ciullo would like to address Mr. Watson's right shoulder once his left shoulder has attained [maximum medical improvement]." (Tr. 391.)

The last treatment note in the administrative record pertains to Dr. Ciullo's January 25, 2011 follow-up with Watson. (Tr. 385.) Watson could only elevate his arm to 90 degrees, but Dr. Ciullo could push it up further. (*Id.*) Watson's strength, therefore, had not caught up with his range of motion. (*Id.*)

### C. Testimony at the Hearing Before the ALJ

#### 1. Plaintiff's Testimony

Watson testified that his shoulders and lower-extremity pain primarily prevented him from working. (Tr. 34.) He explained that if he tried to engage in overhead reaching, it would cause "pulling" in his neck area and tighten his neck. (*Id.*) As for his lower extremities, Watson testified that the area behind his knees and down into his ankles stayed "numb." (Tr. 34.) Watson also explained that because of carpal tunnel syndrome, his left hand would, on occasion, "crunch up." (Tr. 39.)

In terms of treatment, Watson testified to wearing the back brace Dr. Robertson prescribed eight to twelve hours per day. (Tr. 35.) He also testified that he took Vicodin three to four times

8

per day for his pain.  (Tr. 35.)  The Vicodin, however, allegedly made Watson feel "sluggish" and "drows[y]."  (Tr. 36.)

Watson also testified to his activities of daily living.  He stated that he could stand for about 15 or 20 minutes before needing to sit down.  (Tr. 37.)  Even with the benefit of his back brace, Watson said he could sit for "a half hour[,] tops."  (Tr. 38.)  He stated that his walking was probably limited to going around the block, but implied that the limitation was due to feeling "winded" (as opposed to lower-extremity pain).  (*See* Tr. 38.)  Watson testified to being able to mow his lawn, but clarified that the task now took him up to three hours, where, before the accident, it would take a half-hour to 45 minutes.  (Tr. 36.)  He also reported being able to water plants, but explained that it primarily involved moving a hose from place to place and that he did not stand during the task. (Tr. 36-37.)  Watson told the ALJ that after his left-shoulder surgery, he had "more problems with lifting with a stretched out arm," and that holding a half-gallon of milk in that position would cause "a little more pulling up in the neck area."  (Tr. 39.)

## 2. The Vocational Expert's Testimony

A vocational expert ("VE") offered testimony about job availability for a hypothetical individual of Watson's age, education, and work experience who was capable of "sedentary" exertion, but needed a sit-stand option; could only "occasionally" climb stairs, balance, stoop, kneel, crawl, and crouch; could only "occasionally" reach overhead; could not climb ladders, ropes, or scaffolds; and should avoid vibration.  (*See* Tr. 41-42.)  The VE said that there were jobs available for such an individual: bench or final assembler, hand packager, and security monitor.  (Tr. 42.)  The VE further testified that there were thousands of these jobs in southeastern Michigan and hundreds-of-thousands nationally.  (Tr. 40, 42.)

9

**II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK**

Under the Social Security Act (the "Act"), disability insurance benefits "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers

10

to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

At step one, ALJ Xenos found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of January 4, 2009. (Tr. 12.) At step two, she found that Plaintiff had the following severe impairments: spine disorder, history of left shoulder injury, cardiomyopathy, and arthritis. (*Id.*) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 12-13.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to perform

> sedentary work as defined in 20 CFR 404.1567(a) except the claimant would be limited to unskilled, routine work; cannot climb ladders, ropes, or scaffolds; can occasionally climb stairs, balance, stoop, kneel, crouch, and crawl; can occasionally reach overhead; should avoid vibration; and requires a sit/stand option.

(Tr. 13.) At step four, ALJ Xenos found that Plaintiff was unable to perform any past relevant work. (Tr. 18.) At step five, the ALJ found that sufficient jobs existed in the national economy for someone of Plaintiff's age, education, work experience, and residual functional capacity. (Tr. 18-19.) She therefore concluded that Plaintiff was not disabled as defined by the Social Security Act from the alleged onset date through the date of her decision (June 24, 2011). (Tr. 20.)

## III. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation

marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

## IV.  ANALYSIS

Plaintiff says that the "gravamen" of the ALJ's error was her evaluation of the opinion evidence.  (*See* Pl.'s Mot. Summ. J. at 12.)  Plaintiff says that "three main points" support his assertion.  (*Id.*)  First, there was no state agency opinion in the record and so "complete deference should have been given to Plaintiff's physician's opinions."  (*Id.* at 13.)  Plaintiff also asserts that, contrary to ALJ Xenos' view of the record, the objective evidence in fact supports Dr. Beal's and Dr. Robertson's opinions and so she wrongly gave those opinions less than controlling weight.  (*Id.* at 13-14.)  Finally, Plaintiff says that the ALJ cherry picked from Dr. Robertson's and Dr. Ciullo's findings to support her disability determination.  (*Id.* at 15-16.)

As an initial matter, Plaintiff cites no case law, and the Court is not aware of any, that requires an ALJ to give controlling weight to a treating physician's opinion when the record does not contain a contrary state-agency opinion.  And such a bright-line rule would be problematic. There may well be situations where a treating-source opinion is unsupported, or even contradicted, by objective medical evidence of record.  In such a case, the Court sees little reason why the ALJ would be required to adopt the treating-source opinion simply because there is no contrary state-agency opinion.  *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 877 (6th Cir. 2007) ("The SSA will give a treating source's opinion 'controlling weight' *unless* it is either not 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' or is 'inconsistent with the other substantial evidence in [the] case record.'" (emphasis added) (quoting former 20 C.F.R. § 404.1527(d)(2) now 20 C.F.R. § 404.1527(c)(2))).  And, if the treating-source opinion is "patently deficient," it would also be reasonable for the ALJ to reject it altogether — again regardless of whether there is a contrary state-agency opinion in the record.  *Cf. Wilson v. Comm'r of Soc. Sec.*,

378 F.3d 541, 547 (6th Cir. 2004) ("For instance, if a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it, a failure to observe § 1527[c](2) may not warrant reversal."). Thus, to the extent that Plaintiff maintains that an ALJ is, as a matter of law, required to adopt the findings of a treating physician whenever there is no contrary state-agency opinion, this Court disagrees. *Cf. Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) ("[T]he regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant him the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination.").

The stronger version of Plaintiff's argument is also the case-specific one: the ALJ should have given controlling weight to Dr. Beale's and Dr. Robertson's opinions because the objective evidence supports them. In making this argument, however, Plaintiff relies on those physicians' statements that Plaintiff was "disabled." (Pl.'s Mot. Summ. J. at 13.) The law makes plain, however, that it is the ALJ who is exclusively tasked with making the ultimate decision on whether a claimant is disabled within the meaning of the Social Security Act. 20 C.F.R. § 404.1527(d)(1). Therefore, although ALJ Xenos could not completely ignore Dr. Beale's and Dr. Robertson's finding of disability, she did not owe that conclusion any particular deference. *See Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 492-93 (6th Cir. 2010) ("[W]hen a treating physician submits a medical opinion, the ALJ must either defer to the opinion or provide 'good reason' for refusing to defer to the opinion. . . . When a treating physician instead submits an opinion on an issue reserved to the Commissioner—such as whether the claimant is 'disabled' or 'unable to work'—the opinion is not entitled to any particular weight."); *Brock v. Comm'r of Soc. Sec.*, 368 F. App'x 622, 625 (6th Cir. 2010) (holding that ALJ did not inappropriately disregard treating

14

physician's statement that claimant was "100% disabled" because the regulations reserved this determination to the Commissioner (citing former 20 C.F.R. § 404.1527(e)(1), (e)(3) now 20 C.F.R. § 404.1527(d)(1), (d)(3))).

As far as specific functional limitations, neither Dr. Beale nor Dr. Robertson provided any. For example, neither Dr. Beale nor Dr. Robertson ever opined on how far Plaintiff could walk, how much he could lift, or how long he could sit.  The closest either physician came to providing specific limitations was stating that Plaintiff needed assistance with "outside chores of his home" (Tr. 201, 203), that he should avoid activities that "place[d] a load" or "strain[ed]" his musculoskeletal system (*e.g.*, Tr. 281), and that he needed "household assistance/replacement services" (*e.g.*, Tr. 247, 317, 327, 392).  But ALJ Xenos limited Plaintiff to a restricted range of sedentary work.  Simply because Plaintiff needed assistance with his household chores does not necessarily imply that he was incapable of ALJ Xenos' rather limited range of functioning.  It may well be that the household chores and other activities envisioned by Drs. Beale and Robertson were more akin to the exertional demands of "light" work.  As such, Plaintiff has not shown that ALJ Xenos reversibly erred in giving less than controlling weight to Dr. Beale's and Dr. Robertson's ambiguous statements.

Plaintiff's argument regarding Dr. Ciullo, however, warrants remand.  (*See* Pl.'s Mot. Summ. J. at 4, 12.)  This is because the ALJ, despite acknowledging that Dr. Ciullo opined that Plaintiff could not, among other things, engage in overhead activity or do any work above shoulder level (*see* Tr. 16, 232), never assigned a weight to this opinion and never provided any reasons for rejecting it.  The most the ALJ said was, "[d]espite Dr. Robertson and Dr. Ciullo opining that the claimant was disabled from work, as indicated above, this is a determination reserved to the Commissioner." (Tr. 17.)  But unlike Drs. Robertson and Beale, Dr. Ciullo did more than say that Plaintiff was

15

"disabled" — he provided very specific functional limitations.  And it is plain that the ALJ did not adopt those limitations: her RFC permits overhead reaching "occasionally," i.e., up to 1/3 of a workday, whereas Dr. Ciullo precluded all overhead activity (and work above shoulder level). (*Compare* Tr. 13 *with* Tr. 232.)  Accordingly, the ALJ's analysis of Dr. Ciullo's opinion falls short of what is required under this Circuit's precedent.  *See Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) ("Before [rejecting the treating physician's RFC], the ALJ failed to conduct the balancing of factors to determine what weight should be accorded these treating source opinions, and the Commissioner conceded at oral argument that the ALJ did not assign a specific weight to [the treating source's] RFC assessment.  This alone constitutes error."); *Rogers*, 486 F.3d at 243 ("[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."); *Sawdy v. Comm'r of Soc. Sec.*, 436 F. App'x 551, 553 (6th Cir. 2011) (noting that the course of action for failure to comply with the "good reasons" requirement is now "well charted" in the Sixth Circuit: "when an ALJ violates the treating-source rule, '[w]e do not hesitate to remand,' and 'we will continue remanding when we encounter opinions from ALJ[s] that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion.'" (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009))).

The Commissioner implies that the ALJ's error is harmless because Dr. Ciullo's limitations were "pending surgery" and Plaintiff had surgery.  (Def.'s Mot. Summ. J. at 12 n.3.)  But this argument neglects the fact that Dr. Ciullo issued his opinion in September 2009 and Plaintiff's surgery was not until January 2011.  (*See* Tr. 232, 388-90.)  As the ALJ noted, Plaintiff applied for

"period of disability" benefits as well as disability insurance benefits. (Tr. 10.) Moreover, the last treatment record available to the ALJ showed that Plaintiff could not yet lift his surgically-repaired left arm above shoulder height. (Tr. 385.) And Plaintiff still needed surgery on his right shoulder. (Tr. 230, 391.) It is therefore not apparent that Dr. Ciullo's September 2009 limitations expired with the January 2011 surgery. At a minimum, it appears that the ALJ did not consider this possibility in concluding, "although the claimant did have bilateral shoulder injuries, surgical intervention provided relief." (Tr. 17.)

The Commissioner also, albeit only in a single sentence nestled in a footnote, suggests that Plaintiff forfeited any claim based on the ALJ's erroneous treatment of Dr. Ciullo's opinion. (Def.'s Mot. Summ. J. at 12 n.3.) While the Court agrees that Plaintiff's arguments regarding the ALJ's treatment of Dr. Ciullo's opinion are neither focused nor well developed, Plaintiff did assert that (1) "All of Plaintiff's treating physicians, including Dr. James Beale, Dr. J. Alan Robertson *and Dr. Jerome Ciullo* disable Plaintiff from employment based on the subjective and objective findings of record without any contradiction. Under the appropriate legal standards, the Plaintiff's treating physicians' opinions that he is totally disabled are controlling," and (2) "The ALJ also disregarded and/or mischaracterized the medical evidence and opinions of Plaintiff's three treating physicians, Dr. James Beale, Dr. J. Alan Robertson and *Dr. Jerome Ciullo*, that specifically indicated Plaintiff's total disability." (Pl.'s Mot. Summ. J. at 4, 12 (emphases added).)

Moreover, it is far from plain that the procedural aspect of the treating-source rule is solely Plaintiff's to forfeit. One of the purposes of this procedural requirement is to allow the Court to engage in meaningful appellate review:

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations

> where a claimant knows that his physician has deemed him disabled
> and therefore might be especially bewildered when told by an
> administrative bureaucracy that she is not, unless some reason for the
> agency's decision is supplied. *The requirement also ensures that the
> ALJ applies the treating physician rule and permits meaningful
> review of the ALJ's application of the rule*.

*Wilson*, 378 F.3d at 544 (internal quotation marks omitted, emphasis added); *accord* S.S.R. 96-2p, 1996 WL 374188, at *5 (providing that a decision denying benefits "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight"). In fact, at least one court in the Sixth Circuit has rejected the Commissioner's forfeiture argument and *sua sponte* remanded for an ALJ to comply with the explanatory aspect of the treating-source rule. *See Funk v. Astrue*, No. 1:10-CV-2867, 2012 WL 1095918, at *2 (N.D. Ohio Mar. 30, 2012) ("The Commissioner makes arguments that [Plaintiff] has waived any challenge to the ALJ's cursory treatment of evidence from her longstanding treating physician, but it would work a substantial injustice to gut a procedural requirement self-imposed by the Commissioner and intended to protect applicants like [Plaintiff] . . . merely because her counsel whiffed on a challenge characterized by the Commissioner as ubiquitous fare in these cases." (internal quotation marks and citation omitted)).

In short, the ALJ did not adopt Dr. Ciullo's opinion. She may have rejected it; but, assuming so, she did not accompany her rejection with the requisite "good reasons." The law in this Circuit is clear that a Social Security claimant is entitled to know how much weight an ALJ is giving to his treating source's opinion, and, more importantly, why. *Cole*, 661 F.3d at 938; *Rogers*, 486 F.3d at 243; *Hensley*, 573 F.3d at 267. Remand is warranted for such an explanation even when substantial evidence otherwise supports an ALJ's decision. *Rogers*, 486 F.3d at 243; *Sawdy*, 436 F. App'x at 553.

18

Lastly, Plaintiff argues that ALJ Xenos' "characterization of Dr. Robertson and Dr. Ciullo's findings was incomplete and tailored to support her non-medical belief that Plaintiff was not disabled." (Pl.'s Mot. Summ. J. at 15-16.)  But the only medical records that Plaintiff identifies as overlooked pertain to his shoulders.  (*Id.* at 16.)  The Court has already recommended remand for further consideration of Dr. Ciullo's opinion of Plaintiff's shoulder limitations.  So Plaintiff's cherry-picking argument, in the manner presented at least, is moot.

## V.  CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court finds that the ALJ erred in evaluating Dr. Ciullo's September 2009 opinion.  Accordingly, this Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 11) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (Dkt. 14) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.  On remand, the ALJ should analyze Dr. Ciullo's September 2009 opinion consistent with the requirements and factors set forth in 20 C.F.R. § 404.1527(c).

## VI.  FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal

quotation marks omitted); *Frontier*, 454 F.3d at 596-97.  Objections are to be filed through the Case

Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies,

through the Clerk's Office.  *See* E.D. Mich. LR 5.1.  A copy of any objections is to be served upon

this magistrate judge but this does not constitute filing.  *See* E.D. Mich. LR 72.1(d)(2).  Once an

objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be

filed within seven (7) days of service of the response.  E.D. Mich. LR 72.1(d)(3), (4).

 

 

s/Laurie J. Michelson                
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  March 11, 2013

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or
parties of record by electronic means or U.S. Mail on March 11, 2013.

s/Jane Johnson                   
Deputy Clerk

20